IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Mason County Drugs, Inc., an Illinois )
Corporation d/b/a Medicap Pharmacy, )
)
    Plaintiff, )
) No. 05 C 1115
    v. )
) Judge Mark Filip
Medicap Pharmacies, Inc., a corporation, )
)
    Defendant. )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Mason County Drugs, Inc. ("Mason" or "Plaintiff"), a retail pharmacy and franchisee, filed suit against Medicap Pharmacies, Inc. ("MPI" or "Defendant"), a franchisor of retail pharmacies, in connection with a franchise dispute. (D.E. 7 (the "Complaint").)[1] The Complaint seeks a declaratory judgment that Mason may consummate a proposed transaction with Mitchell Weingart or similar transaction under the Mason-MPI franchise agreement (Count I), and further alleges that MPI tortiously interfered with Plaintiff's contract with Weingart (Count II) and negligently misrepresented the terms of the franchise agreement (Count III). (Id. at 2-6.) The case is before the Court on Plaintiff's motion for summary judgment as to Count I. (D.E. 32.)[2] For the reasons discussed below, Plaintiff's motion for summary judgment is denied.[3]

---

[1]      Plaintiff initially joined Medicine Shoppe International, Inc. ("MSI") as an interested party defendant under Federal Rule of Civil Procedure 19. (D.E. 7 ¶ 5.) The Court previously granted MSI's motion to dismiss the claim against MSI because the Complaint contained no meaningful averments with respect to MSI and accordingly failed to even outline or adumbrate a claim against it. (D.E. 30.) That dismissal was without prejudice (id.); Plaintiff has not since offered any amended complaint that would seek to include MSI.

[2]      Plaintiff filed a motion to strike an affidavit (D.E. 35) that was submitted by Defendant in connection with its response. While the Court believes that some of Plaintiff's objections are not well taken (e.g., the objection that the affidavit is "self-serving"), the Court

I.  Relevant Facts[4]

Mason entered into a twenty-year franchise agreement in June 1997 with MPI (the "Franchise Agreement"). The Franchise Agreement permitted Mason to operate its retail

---

agrees that the affidavit contains certain impermissible conclusory statements (*i.e.*, ¶ 5 (second sentence), ¶ 6 (second sentence), ¶ 8 (second two sentences)), at least given the limited foundation offered in the affidavit. *See, e.g.*, Fed. R. Civ. P. 56(e) ("[A]ffidavits shall be made on personal knowledge [and] shall set forth such facts as would be admissible in evidence . . . ."); *Palmer v. Marion County*, 327 F.3d 588, 596 (7th Cir. 2003) (citing and quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) ("The object [of Rule 56(e)] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit.")); *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999). Other portions of the affidavit essentially assert legal conclusions, and without any basis for offering them (*i.e.*, ¶ 7 (first sentence), ¶ 8 (first sentence)). Such portions are likely inadmissible as well, although Plaintiff does not assert any objection on that specific basis. In the end, given the procedural posture of the case, with MPI as the non-movant on a summary judgment motion, any evidentiary issues about the affidavit are not of material significance. The non-movant is entitled to the benefit of doubt on legitimate factual disputes and inferences, and the affidavit, at least at times, offers assertions that are sufficiently grounded in commonsense (*e.g.*, that a pharmacy's customer prescription files are analogous to an ordinary business's customer list (¶ 5 (first sentence)), and that the transfer of telephone numbers is a component of transferring an on-going business (¶ 5, third sentence))), that summary judgment for Plaintiff would be unwarranted even if the affidavit were entirely disregarded.

[3]  Defendant submitted a document entitled "Memorandum of Law in Support of Defendant's Response to Plaintiff's Motion for Summary Judgment on Count I and in Support of Its Cross Motion for Summary Judgment on Count I." (D.E. 38.) Defendant, however, failed to submit a cross motion for summary judgment on Count I. Thus, the Court declines to rule on any such motion at this juncture.

[4]  The relevant facts are taken from the Plaintiff's Local Rule 56 .1 ("L.R.56.1") statement of facts and exhibits (D.E. 34) and Defendant's response to Plaintiff's statement of facts and statement of additional facts (D.E. 37). The facts in this case, at least those that are properly supported in the statements of fact, are almost entirely uncontroverted. To the extent a material fact is in dispute, where a party failed to properly support its denial of a statement, and that statement is properly supported in the record, the Court deems it admitted. Local Rule 56.1(a); *accord, e.g., McGuire v. United Parcel Serv.*, 152 F.3d 673, 675 (7th Cir. 1998); *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000). In addition, the Court, as it must, resolves genuine factual ambiguities in the non-movant's favor. *See, e.g., Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

pharmacy as a Medicap Pharmacy. (D.E. 34 ¶ C1; D.E. 7, Ex. A.) The relevant provisions of the Franchise Agreement are as follows:

> SECTION III
>
> The Franchisee [Mason] shall:
>
> (01) Establish . . . a pharmacy identified as Medicap Pharmacy®, and maintain that store as a Medicap Pharmacy® store throughout the term of this Agreement.
>
> * * *
>
> (10) Refrain from selling, giving away, or otherwise encumbering any of the records or files related to customers of the Franchisee's Medicap Pharmacy® store except in connection with a sale or transfer of this Agreement in accordance with the provisions of Sections VIII and XII of this Agreement.

(D.E. 7, Ex. A at 3-4.)

> SECTION XV
>
> This Agreement shall . . . expire twenty (20) years after the opening of your Medicap Pharmacy store.

(*Id.* at 20.)

> SECTION VI
>
> The Company [MPI] may terminate this Agreement effective thirty (30) days after delivery of notice of default to the Franchisee: upon the occurrence of any of the following events of default:
>
> * * *
>
> (08) The Franchisee sells or leases the business (such sale or lease to encompass disposition of fifty percent (50%) or more of voting or membership rights of a corporation, limited liability company or partnership interest having policy control) without first having obtained the approval of the Company to such sale or lease and without first having complied with the requirements respecting the first right of refusal extended the Company and specified in this Agreement . . . .

(*Id.* at 11-12.)

3

SECTION VIII

The Franchise (or ownership of the business operated under the Franchise) cannot be assigned by the Franchisee without the prior written permission of the Company, which permission shall not be unreasonably withheld if the following conditions and requirements are first satisfied . . . .

(01) The transferee shall be of good moral character and reputation and shall have a good credit rating, financial capabilities, and competent business qualifications acceptable to the Company. The Franchisee shall provide the Company with such information as it may reasonably require to make a determination concerning each proposed transferee.

(02) The transferee shall sign a new Franchise Agreement with the Company, in the form then being used by the Company, in connection with the grant of franchises, payment and performance under which shall be personally guaranteed by all shareholders or partners of the transferee.

\* \* \*

(*Id.* at 14.)

SECTION XII

Should the Franchisee receive a bona fide offer for the purchase or lease of all or a substantial part of the Medicap Pharmacy® store (meaning fifty (50%) or more of the assets or value of the assets thereof) or, if the Franchisee is a . . . corporation, an offer to purchase such percentage of interest as would constitute an aggregate change of fifty percent (50%) or more from the ownership obtaining as of the date hereof, the Company shall be promptly advised in writing as to the terms and conditions of such bona fide offer and the name of the prospective buyer or lessor. The Company shall have the prior right to purchase or lease said business, assets, or interest that are subject to such offer on the same terms as the bona fide offer within a period of thirty (30) days following the date of receipt of notice of the offer, the name of the offeror, and the terms of the offer; [ . . . .] Should the Company elect to purchase or lease within said period, it shall give written notice thereof and shall use its best efforts to close such purchase or lease not later than thirty (30) days after the date of affirmative election.

If, however, the Company fails to given [sic] such notice or rejects such right of first refusal within said thirty (30) day period, the Franchisee shall be free to consummate the sale or lease to the proposed buyer or lessor at any time within forty-five (45) days thereafter upon terms and conditions no less favorable to the

Franchisee than those specified in the terms of the offer received by the Company. If for any reason such sale or lease is not consummated within such forty-five (45) day period (except by virtue of extension agreed to by the Company not exceeding ninety (90) days thereafter), such right of first refusal shall again apply and no subsequent sale or lease shall be made except pursuant to the terms hereof. This right of first refusal shall again apply upon each and every successor to or assignee of the Franchisee, including bona fide purchasers.

(*Id.* at 17.)

On October 14, 2004, Mason entered an agreement with Mitchell Weingart ("Weingart") (the "Weingart Contract"). (D.E. 34 ¶ C2; D.E. 7, Ex. B.) Pursuant to the Weingart Contract, Mason agreed, *inter alia*, to "sell, transfer, assign and convey" (*id.* at 1), for an aggregate purchase price of $1.2 million, the pharmacy's merchandise inventory; its prescription files and operational records; all related goodwill; and the pharmacy's telephone and fax lines, including a transfer of existing telephone and fax numbers. (*Id.* at 1-3.) The agreement also calls for a two-year non-competition agreement. (*Id.* at 3, 7-8.) The Weingart Contract also provides, as a condition precedent, that the parties will execute a lease for the Bartonville, Illinois pharmacy premises. (*Id.* at 12.) Mason subsequently sent MPI written notice of the existence of the Weingart Contract. (D.E. 34 ¶ C5; D.E. 7, Ex. C.)

M.J. Connell ("Connell"), general counsel for MPI, responded to the notice with several letters to Mason's counsel. (*See, e.g.*, D.E. 34 ¶ C8; D.E. 7 Exs. D and F.) The April 13, 2004 letter states that:

> Section III [of the Franchise Agreement] requires that . . . [Mason] establish a pharmacy identified as Medicap Pharmacy *and maintain* that store as a Medicap Pharmacy® store throughout the term of the Agreement – until June 29, 2018 for Bartonville [location] . . . . A franchisee may be released from Section III if they meet the requirements of Section VIII *and* Section XII.
>
> Section VIII provides that the Franchise *or ownership of the business operated*

*under the Franchise* cannot be assigned by the Franchisee without the prior written consent of MPI and satisfaction of certain conditions including the requirement that the transferee sign a franchise agreement. Section XII which provides MPI a prior right to purchase a Franchisee's business, does not extinguish the requirements of Section VIII regarding the transfer of business, nor does it extinguish the obligation of the Franchisee to maintain a Medicap Pharmacy® for the term of the agreement.

Because the proposed . . . [Weingart Contract] does not provide for the transfer of the franchise agreement and the continued operation of a Medicap Pharmacy® business, MPI does not consent to this transaction.

(D.E. 7, Ex. F (emphases in original).)

Count I of the Complaint claims that, as a result of MPI's objection to the Weingart Contract, Weingart eventually withdrew from the proposed transaction. (D.E. 7 ¶¶ 28-31.) Mason requests that the Court enter a declaratory judgment providing, *inter alia*, that MPI "has breached the Franchise Agreement by its conduct" in response to the proposed Weingart transaction. (*Id.* at 5.)

II.     Jurisdiction and Choice of Law

The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Mason and MPI are citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of interests and costs.

With respect to choice of law, the parties in this case have based their briefs upon Illinois law. "The operative rule is that when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits." *Wood v. Mid-Valley, Inc.*, 942 F.2d 425, 426 (7th Cir. 1991); *accord, e.g., Coleman v. Ramada Hotel Operating Co.*, 933 F.2d 470, 473 (7th Cir. 1991). In addition, the Franchise Agreement provides that it shall be governed by Illinois law (D.E. 7, Ex. A at 19), and Illinois courts

6

generally honor a contract's choice-of-law provision. *See, e.g., Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 705 (7th Cir. 2004). The Court will therefore apply Illinois law in interpreting the contract at issue.

III. Summary Judgment Standard

Issues of contract interpretation are usually questions of law for the Court. *See, e.g., Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998); *Sheehy v. Sheehy*, 702 N.E.2d 200, 204 (Ill. App. Ct. 1998). Accordingly, "[t]he interpretation of a contract is an issue particularly well-suited for resolution by summary judgment." *Baker v. Am.'s Mortgage Servicing, Inc.*, 58 F.3d 321, 326 (7th Cir. 1995) (citing *Metalex Corp. v. Uniden Corp. of Am.*, 863 F.2d 1331, 1333 (7th Cir. 1988)). Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The nonmovant cannot rest on the pleadings alone, but must identify specific facts, *see Cornfield v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir. 1993), that raise more than a scintilla of evidence to show a genuine triable issue of material fact. *See Murphy v. ITT Educ. Servs., Inc.*, 176 F.3d 934, 936 (7th Cir. 1999) (citation omitted). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

IV. Discussion

   A. Threshold Matter

Before engaging in a substantive analysis of the pending summary judgment motion, the Court briefly addresses a threshold issue regarding Plaintiff's request for declaratory relief. The Declaratory Judgment Act provides that a federal court may issue a declaratory judgment only in the case of an "actual controversy." 28 U.S.C. § 2201(a). Even though Mason and MPI do not dispute the existence of an actual controversy, the actual controversy requirement cannot be conceded, waived, or assumed. *See, e.g., Travelers Indem. Co. v. Standard Accident Ins. Co.*, 329 F.2d 329, 330 (7th Cir. 1964) (stipulation by parties regarding existence of actual controversy immaterial). Accordingly, the Court verifies *sua sponte* the existence of an actual controversy with respect to Count I.

When deciding on the existence of an actual controversy, the question is whether there is a substantial controversy between parties with adverse legal interests "'of sufficient immediacy and reality to warrant issuance of a declaratory judgment.'" *In re VMS Sec. Litig.*, 103 F.3d 1317, 1327 (7th Cir. 1996) (quoting *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). Federal courts have "wide discretion" in deciding whether to exercise their jurisdiction regarding a declaratory judgment claim. *See, e.g., In re VMS Sec. Litig.*, 103 F.3d at 1327 (collecting cases); *Mieling v. Norkar Techs., Inc.*, 176 F. Supp. 2d 817, 819 (N.D. Ill. 2001) (Castillo, J.).

In the instant case, MPI stated that it would sue Mason and Weingart for interfering with the Franchise Agreement if Mason proceeded to act upon the Weingart Contract and to consummate the Weingart transaction. (*See, e.g.,* D.E. 33 at 5.) Precedent instructs that the

8

mere chance of suit is not by itself sufficient to create an "actual" controversy and justify the invocation of the ability and power to issue a declaratory judgment. *See, e.g., Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 712 (7th Cir. 2002). Instead, in a typical declaratory judgment action, the "'natural' defendant wants to proceed with a business opportunity–*e.g.*, the production of widgets–but it is impeded because of a lack of clarity as to its legal rights, fearing something like a possible patent infringement suit." *Id.* at 711 (citing 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2751 at 455-56 (3d ed. 1998)). In this case, Mason seeks early resolution of a threat of litigation, but also is restrained from engaging in "extra-judicial conduct" (*i.e.*, entering into the Weingart Contract or a similar contract with some other party) as long as the question of whether MPI "breached the Franchise Agreement by its conduct" (D.E. 7 at 5) in response to the proposed Weingart transaction is unclear. *See Coco*, 302 F.3d at 711-12. Accordingly, the Court finds that the Article III actual controversy requirement is satisfied with respect to Count I. The Court therefore proceeds to analyze the question of whether MPI "breached the Franchise Agreement by its conduct" in connection with the Weingart Contract and transaction. (D.E. 7 at 5.)

B.  Substantive Summary Judgment Arguments

Plaintiff argues that Section XII of the Franchise Agreement permits it to consummate the Weingart Contract or a similar agreement without interference because MPI has not exercised its right of first refusal on the Weingart deal. Or, put differently, Mason argues that MPI had and has no basis to object to the Weingart deal once MPI declined to trigger its right of first refusal. The Court respectfully disagrees.

Franchise agreements are interpreted using the commonly accepted rules of contract

9

construction. *See, e.g.*, 6 Fletcher Cyclopedia of Private Corp. § 2585 (collecting cases). Contract construction seeks to give effect to the intentions of the parties, which is ascertained from the words used in the contract. *See, e.g., Harrison v. Sears, Roebuck & Co.*, 546 N.E.2d 248, 253 (Ill. App. Ct. 1989) ("The primary objective of contract construction is to give effect to the intention of the parties. This intention should be ascertained from the words used in the contract.") (citation omitted). If the terms of the contract are unambiguous, they are given their ordinary, plain, and natural meaning. *Id.* (citing *Reynolds v. Coleman*, 527 N.E.2d 897, 902 (Ill. App. Ct. 1988)); *see also Emergency Med. Care v. Marion Mem'l Hosp.*, 94 F.3d 1057, 1061 (7th Cir. 1996) (citing *CSX Transp. v. Chicago and Northwestern Transp.*, 62 F.3d 185, 190 (7th Cir. 1995)); *River Forest State Bank and Trust v. Rosemary Joyce Enterp., Inc.*, 689 N.E.2d 163, 179 (Ill. App. Ct. 1998).

The intent of contracting parties is not gathered from any single clause or provision standing by itself, but instead each provision is viewed in the light of all the other parts of the agreement. *See, e.g., United Airlines, Inc. v. City of Chicago*, 507 N.E.2d 858, 861 (Ill. 1987). In other words, contracts are considered in their entirety. *See, e.g.*, 11 Williston on Contracts § 32:5 (4th ed.) ("A contract will be read as a whole and every part will be read with reference to the whole. If possible, the contract will be so interpreted as to give effect to its general purpose as revealed within its four corners or in its entirety."); *accord, e.g., Miniat v. Ed Miniat, Inc.*, 315 F.3d 712, 715 (7th Cir. 2002) (in interpreting a contract, the document should be read as a whole).

Mason argues that MPI has no contractual basis for its objection to the Weingart Contract. Mason contends that its relevant obligation under the Franchise Agreement was to

10

offer MPI the right of first refusal to the proposed Weingart transaction, pursuant to Section XII of the Franchise Agreement, and that once MPI declined to contract with Mason on those terms, then Mason was free to consummate the Weingart Contract with Weingart without further regard to MPI. The Court respectfully disagrees.

Section XIV of the Franchise Agreement provides that the remedies "in favor of the Company [MPI] . . . shall be cumulative." (D.E. 7, Ex. A at 18.) As a result, it is not enough for Mason to establish that it fulfilled its obligations under Section XII of the Franchise Agreement concerning MPI's right of first refusal. Instead, all other conditions must be satisfied.

One relevant provision with respect to the proposed Weingart transaction is Section VIII of the Franchise Agreement, which provides that "[t]he Franchise (or ownership of the business operated under the Franchise) cannot be assigned by the Franchisee without the prior written permission of the Company [MPI], which permission shall not be unreasonably withheld" so long as various specified "conditions and requirements are first satisfied." (*Id.*, Ex. A at 14.) It is difficult to see how the proposed Weingart transaction could be said to not implicate this provision. The Weingart Contract specifically states that Mason will "sell, transfer, *assign and convey*" (D.E. 7, Ex. A at 1 (emphasis added) to Weingart, *inter alia*: the merchandise inventory, the customer prescription files and operational data, all related goodwill, and the telephone and facsimile lines (including the telephone and facsimile numbers used in the operation of the store). (*Id.* at 1-3.) The agreement also calls for a two-year non-competition agreement. (*Id.* at 3, 7-8.) The Weingart Contract also provides, as a condition precedent, that the parties will execute a lease for the Bartonville, Illinois pharmacy premises. (*Id.* at 12.) And there is a transfer of operational licenses and a promise by Mason to cooperate with the buyer concerning the buyer's

transfer of or application for operational permits and licenses. (*Id.* at 10.) In sum, the Weingart Contract calls for the assignment, transfer, and sale not only of certain physical assets, but also of critical intangible rights and assets that make up the business itself (*e.g.*, the phone numbers, the goodwill, and the customer list and data *via* the prescription files). If the Weingart Contract were consummated, it appears that there would be few, if any, remaining assets with any economic value for Mason, nor could Mason meaningfully continue to operate the business in light of the transfer.

Under such circumstances, it would strongly appear that the proposed Weingart transaction on its face implicates Section VIII's prohibition against assignment of the ownership of "the business operated under the Franchise"—absent fulfillment of various specified preconditions and MPI's permission, "which permission shall not be unreasonably withheld." (D.E. 7, Ex. A at 14.) This conclusion is confirmed by a full review of the Franchise Agreement, which reveals that the term "business operated under the Franchise" refers to the business operations of the pharmacy, and is not used in a technical sense to refer to the particular corporate entity or other business form that owns the pharmacy. Thus, for example, the Franchise Agreement speaks of the Franchisee operating "a pharmacy business" (*id.* at 2), the Franchisee's "operation of its business" (*id.* at 8), and the Franchisee's "business operation as a pharmacy" (*id.* at 11). The Franchise Agreement also addresses what shall occur if the pharmacy discontinues its business operations and "the business fails to reopen within ninety . . . days." (*Id.* at 12.) These uses of the term "business" in the Franchise Agreement confirm that the most natural reading of the term "business operated under the Franchise" in Section VIII is the one in fact employed in the Franchise Agreement—namely, the "business operated under the Franchise"

12

is the pharmacy and its business activities in a practical, operational sense, and not merely the corporate form that may own stock or interests in the business. (*Accord* D.E. 7, Ex. A at 12 (Franchise Agreement discussing a sale or lease of "the business," which "encompass[es]" [*i.e.*, includes, but is not defined as] disposition of 50% or more of various corporate ownership rights).) As a result, the Weingart transaction and Weingart Contract—by which Mason would "sell, transfer, assign and convey" the lion's share (if not effectively all) of the economic value of the pharmacy's business—is subject to the requirements of Section VIII.

Before moving on, the Court notes that the Weingart Contract's characterization of the nature of the proposed Weingart transaction is consistent with a material body of caselaw. Thus, in *Cinicola v. Sharfenberger*, 248 F.3d 110 (3d Cir. 2001), the Third Circuit stated, "[e]very sale of property always involves assignment of property rights. Assignment of the property right gives rise to payment." *Id.* at 123-24 (finding that a sale of an executory contract triggers the protections afforded sales of bankruptcy estate property under section 363 of the Bankruptcy Code, in addition to satisfaction of the requirements of assigning a contract under section 365); *accord, e.g., In re Kmart Corp.*, No. 03 C 698, 2003 WL 1956149, *3 (N.D. Ill. Apr. 23, 2003) (Aspen, J). In this regard, *Cinicola*, drawing upon Black's Law Dictionary, stated:

> The synonymous definitions of assignment and sale add further weight for considering the terms together. An assignment is by definition:
>
> [The] act of transferring to another all or part of one's property interest, or rights. A transfer or making over to another of the whole of any property, real or persona, in possession or in action, or of any estate or right therein. It includes transfers of all kinds of property, including negotiable instruments. The transfer by a party of all of its rights to some kind of property, usually intangible property such as rights in a lease, mortgage, agreement of sale or a partnership. Tangible property is more often transferred by possession and by instruments conveying title such as a

13

deed or a bill of sale. *Black's Law Dictionary* 119 (6th ed. 1990) (citation omitted).

> A sale by definition is a 'revenue transaction where goods or services are delivered to a consumer in return for cash or a contractual obligation to pay. Term comprehends transfer of property from one party to another for valuable recompense.' *Id.* at 1337.

*Id.* at 124 n.15 (additional internal citations omitted). While the Court need not and does not purport to draw any categorical, all-encompassing conclusion about sales and assignments, the Court notes that the express characterization of the Weingart transaction provided in the Weingart contract is, at a minimum, consistent with cases like *Cinicola* and the analysis therein.[5]

Given the conclusions reached above, the fact that MPI did not exercise its right of first refusal on the Weingart transaction does not thereafter allow Mason to consummate the Weingart Contract without regard to MPI. To take just one example, Section III (10) of the Franchise Agreement provides that Mason shall refrain from "selling, giving away, or otherwise encumbering any of the records or files relating to customers of [Mason's] Medicap Pharmacy® except in connection with the sale or transfer of this Agreement in accordance with the

---

[5] The Court rejects Mason's apparent suggestion, made in passing (see D.E. 42 at 2) that it is undisputed that the Weingart Contract involves a sale of assets *simpliciter*. This assertion is predicated on an improperly-supported assertion of material fact in Mason's Local Rule 56.1 statement (*see* D.E. 34 at 3, ¶ 2), which is not supported by the very document offered as the basis for it. Mason does not expressly cite to other improperly supported assertions of material fact (*see id.* at 4, ¶¶ 9-10), but the Court notes that those paragraphs not only lack support (which is itself fatal for them) but they also are in effect legal assertions, which are not the proper subject of a Rule 56.1 assertion in any event. *See, e.g., Miller v. Ameritech Corp.*, No. 02 C 2286, 2005 WL 2266614, *1 (N.D. Ill. Sept. 17, 2005) (Lefkow, J.) ("It is . . . improper to include legal argument or legal conclusions in the Local Rule 56.1 statements of material facts and responses thereto.") (citation omitted); *City of Country Club Hills v. U.S. Dept. of H.U.D.*, No. 99 C 7139, 2001 WL 1117276, *1 (N.D. Ill. Sept. 17, 2001) (Leinenweber, J.) (striking various paragraphs of a Local Rule 56.1 statement and stating that the "paragraphs contained legal argument or conclusions of law that have no place in a statement of facts.") (citing L.R. 56.1(b)(3)(B)).

provisions of Sections VIII *and* XII of this Agreement." (D.E. 7 Ex. A at 3 (emphasis added).) The Weingart Contract specifically provides for the assignment, sale, and transfer of all of the "prescription files, records and data" for the aggregate purchase price of $850,000.00 (or over two-thirds of the price of the entire transaction). (D.E. 7 Ex. B at 1-2.) This provision clearly falls within Section III (10)'s prohibition on the transfer of any customer records or files absent compliance not only with Section XII (which sets forth the right of first refusal), but also the written permission requirement of Section VIII.

Mason suggests at one point that the contractual arrangement called for under the Franchise Agreement cannot be as it appears because such an arrangement would be unreasonable. *See* D.E. 42 at 2. This contention is not persuasive. Under the Franchise Agreement, MPI is barred from unreasonably withholding consent to a transaction such as the proposed Weingart deal so long as certain objectively verifiable and/or benign conditions are satisfied—such as that the "transferee shall be of good moral character . . . and [have a] good credit rating, financial capabilities and competent business qualifications . . . . " (D.E. 7, Ex. A at 14.) The "transferee [also] shall sign a new Franchise Agreement with the Company" (*id.*), and "[a]ll accrued money obligations of the Franchisee to the Company shall be satisfied prior to the assignment or transfer." (*Id.*) Mason does not suggest that MPI unreasonably or erroneously concluded that the proposed Weingart transaction failed to satisfy these preconditions as set forth in the Franchise Agreement.[6]

---

[6] Mason also asserts that "it is not reasonable to believe that the twenty (20) year term of the Franchise Agreement would continue in the event of a sale . . . to an outside buyer." (D.E. 42 at 4.) However, this position ignores language in Section XII of the Franchise Agreement, upon which Mason would otherwise rely, which includes as its last sentence: "This right of first refusal shall again apply upon each and every successor to or assignee of the Franchisee, including bona

15

Nor does the fact that Section VIII allows MPI to refuse consent unless the putative "transferee shall sign a new Franchise Agreement with the Company" (*id.*) render the interpretation of the Franchise Agreement vis-a-vis the Weingart Contract and transaction discussed above unreasonable or suspect. In fact, Mason appears to acknowledge that, in a subsequent franchise agreement that it executed in 2000 with MPI for a pharmacy in Peoria, Illinois, Mason indisputably agreed that if it attempted to sell or lease "all or a substantial part of the [Peoria] Medicap Pharmacy® store," Mason could not consummate such a deal unless "the transaction would include the sale or assignment of this [franchise] Agreement (subject to the consent of the Company as provided in Section VIII [of the franchise agreement])," and further subject to the Company being offered a right-of-first refusal on the deal. (D.E. 42, Ex. 1 at 17-18.) Thus, Mason itself concedes that it (or its principal owner) has contracted with MPI on the very terms that it suggests are unreasonable enough to call into question the Court's interpretation of the Franchise Agreement in the case *sub judice*. As a result, and for the other reasons explained above, the Court does not find Mason's unreasonable-interpretation contention persuasive.[7]

---

fide purchasers." (D.E. 7, Ex. A at 17.)

[7] The Court also respectfully rejects Mason's suggestion (D.E. 42 at 3) that the fact that a later franchise agreement executed by Mason's principal and MPI is even *clearer* about MPI's right to require the transfer of the franchise agreement to the successor (again, with MPI's consent not to be unreasonably withheld) indicates that the Franchise Agreement at issue in this case did *not* provide for approval of MPI (and the ability to insist on a successor franchise relationship) in relation to the proposed Weingart Contract and transaction. First, as a matter of process, this argument is improperly raised for the first time in the reply brief, complete with the proffer of a later franchise agreement that was not properly presented in connection with Mason's summary judgment motion and Local Rule 56.1 materials. Second, as a matter of substance, MPI may have decided to clarify language to make it even more explicit—because, from an operational perspective, there are advantages to having contractual language so clear that another

16

Finally, to the extent Mason contends that the Franchise Agreement should be interpreted against MPI, the drafter of the agreement, such contention is off the mark. The principle that a contract is to be construed against the drafter (sometimes more formally referred to as the principle of *contra proferentum*) only comes into play if the contract is ambiguous or contains inconsistent or conflicting terms. *See, e.g., Archer-Daniels Midland Co. v. Pheonix Assurance Co.*, 936 F. Supp. 534, 539 & n.3 (S.D. Ill. 1996) (collecting Illinois appellate authorities); *Moore v. Lomas Mortgage USA*, 796 F. Supp. 300, 305 (N.D. Ill. 1992) (Zagel, J.) (collecting cases). The principle is a "rule of last resort" not to be invoked simply to reach a result favoring the party who did not draft the agreement. *Id.* at n.8 (citing and discussing Corbin, 3 Corbin on Contracts § 559 (1960)). There is no relevant ambiguity in the Franchise Agreement that would implicate this interpretive principle on the facts of the case.

---

party cannot even argue about its meaning. That is why, for example, contracts often contain "apparently superfluous language," designed "to make assurance doubly sure" about an issue so as to forestall any argument about the issue. *In re Chicago, Milwaukee, St. Paul and Pacific R.R. Co.*, 791 F.2d 524, 530 (7th Cir. 1986). However, the fact that a particular right or outcome was made even more explicit in a later contract does not mean that a prior contract provided for an opposite result.

IV. Conclusion

For the reasons set forth above, Plaintiff's motion for summary judgment is denied. MPI did not act outside its rights in connection with the proposed Weingart Contract and transaction, and Mason accordingly is not free to consummate the Weingart Contract and transaction or a similar contract or transaction.

So ordered.

*[signature]*
Mark Filip
United States District Judge
Northern District of Illinois

Date: 2-8-06